**James J. McCAFFREY et al.**

v.

**Markham L. GARTLEY, Secretary of State.**

Supreme Judicial Court of Maine.

Oct. 3, 1977.

**1368**

Wilk & Scott by Gordon H. S. Scott, Augusta, for plaintiffs.

Donald G. Alexander, Deputy Atty. Gen., Augusta, for defendant.

Before POMEROY, WERNICK, ARCHI-BALD, DELAHANTY, GODFREY and NICHOLS, JJ.

GODFREY, Justice.

In accordance with section 18 of article IV, part 3, of the Maine Constitution, a duly initiated bill to repeal the uniform property tax was presented to the 108th Legislature at its first session.[1]  Where the Legislature does not enact an initiated bill without

---

1. The text of the initiated bill is set forth in Appendix A to this opinion.  On January 19, 1977, petitions signed by plaintiffs and other electors, addressed to the 108th Legislature, were filed with the Secretary of State, and on January 26 the· Senate was notified of the petitions.

change, section 18 provides that the bill shall be submitted to the electorate at a special election. By proclamation of the Governor, that special election will be held on December 5. If approved by the electorate, the bill would repeal outright four provisions of the state tax law establishing or relating to the uniform property tax and one cognate provision of the school funding law, and it would replace two particular provisions of the school funding law with a single new provision.

After receipt of the initiative bill, the 108th Legislature passed successively, as emergency legislation, two inconsistent measures [2] each amending section 451(2) of the uniform property tax law. The earlier measure merely moved the annual deadline for the Legislature to set the uniform property tax rate from April 1 to April 14 of each year. The later measure, chapter 109, which called for a deadline of April 1, deleted a provision establishing the rate for the tax at 12.5 mills after June 30, 1977, and replaced it with a provision that the Legislature should set the rate in accordance with title 20, section 3747; i. e., to yield revenues not exceeding fifty per cent of the State's basic education allocation as established by the Legislature.[3] Later in the session it enacted, as section 131–A of chapter 564, "An Act to Make Additional Corrections of Errors and Inconsistencies in the Laws of Maine", a measure repealing and replacing the same section as amended, of the uniform property tax law. Section 131–A again made April 14 the deadline for the Legislature to set the uniform property tax rate and provided, as chapter 109 had,

that the Legislature would set the rate in accordance with title 20, section 3747. The statute to correct errors and inconsistencies in which the changes were included was emergency legislation, duly passed by two-thirds vote, and therefore, by virtue of section 16 of article IV, part 3, of the Maine Constitution, took effect immediately when approved by the Governor on July 23.[4]

The Secretary of State intends to include on the December 5 initiative ballot an option to vote for the amendment contained in section 131–A of the errors and inconsistencies act on the ground that it is a measure competing with the initiative bill. The result would be a ballot with three choices for the voters: to vote for the initiated bill, for the amendment enacted as section 131–A, or for the pre-1977 version of the statutory provisions that the initiated bill seeks to repeal.

Plaintiffs filed this action against the Secretary of State seeking a declaratory judgment that the proposed ballot fails to conform to certain requirements of the Maine Constitution. Plaintiffs allege that they are citizens of Maine who signed the initiating petitions, that they are voters entitled to vote on the question, and that they are owners of real property that is liable for payment of taxes assessed under the uniform property tax statutes. They assert that the 1977 amendments are not an "amended form" or "substitute" or "recommendation" of the Legislature that should go on the ballot as a competing measure under section 18 of article IV, part 3, of the constitution.[5] They further assert that the

2. P.L.1977, ch. 48, § 3 and P.L.1977, ch. 109.

3. 20 M.R.S.A. § 3747, subsec. 8.

4. Me.Const. art. IV, pt. 3, § 16 (1976 Supp.):
"No Act or joint resolution of the Legislature, except [certain types of orders or resolutions not pertinent here] shall take effect until ninety days after the recess of the session of the Legislature in which it was passed, unless in case of emergency, which with the facts constituting the emergency shall be expressed in the preamble of the Act, the Legislature shall, by a vote of two-thirds of all the members elected to each House, otherwise direct. An emergency bill shall

include only such measures as are immediately necessary for the preservation of the public peace, health or safety; and shall not include [certain matters not pertinent here]."

5. Me.Const. art. IV, pt. 3, § 18 (1976 Supp.) provides in part, as follows:
"The electors may propose to the Legislature for its consideration any bill, resolve or resolution, including bills to amend or repeal emergency legislation but not an amendment of the State Constitution, by written petition addressed to the Legislature or to either branch thereof  .   . .. Any measure thus proposed by electors, the number of which shall not be less than ten percent of the total

alleged failure to follow required procedures deprives them of their right to initiate legislation and have the measure presented "concisely and intelligibly" as required by section 20 of article IV, part 3, of the constitution.[6] The case is before this court on report from the Superior Court, Kennebec County, pursuant to an expedited appeal, the Superior Court not having passed on the merits of the dispute.

### Standing

■ This action brings before the Court the standing issue noted but not resolved in *Kelly v. Curtis*, 287 A.2d 426 (Me.1972). Although the Secretary of State has not questioned standing, the issue will still be considered on appeal. *Nichols v. City of Rockland*, 324 A.2d 295 (Me.1974).

[2] This Court must determine whether plaintiffs have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions". *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962). Long before *Baker v. Carr*, the Supreme Court had acknowledged that a political interest, though shared with a large segment of the public, could serve in an otherwise appropriate case as a basis for standing. *Smiley v. Holm*, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932); *Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). The Maine Supreme Judicial Court, also, has recognized that a claimant asserting a political right may have standing. In *Jones v. Maine State Highway Commission*, 238 A.2d 226, 229 (Me.1968), we said,

> vote for Governor cast in the last gubernatorial election preceding the filing of such petition, unless enacted without change by the Legislature at the session at which it is presented, shall be submitted to the electors together with any amended form, substitute, or recommendation of the Legislature, and in such manner that the people can choose between the competing measures or reject both."

"Plaintiff does not allege financial 'damage,' actual or threatened. The removal of tolls casts the financial responsibility of maintaining the bridge and retiring its bonds upon 'the general highway fund,' the source of which is not direct taxation (23 M.R.S.A. § 1651) and the effect of which upon him, plaintiff seems to concede is minimal. In the language of the day he alleges loss of a civil right, —the right to vote on the removal of the toll charges. If he has been wrongfully deprived of such right, it is a substantial loss and of recognized justiciability."

■ In the present case, plaintiffs allege that as voters, property taxpayers, and signers of the initiative they have an interest in assuring the success of the initiative petition. They allege that they have a right under the Maine Constitution to have the question presented according to constitutional requirements and that those requirements include a provision in article IV, part 3, section 20, that the proposal be presented "concisely and intelligibly." Finally, they claim that the Secretary of State's plan will not meet those requirements and thus threatens the success of the petition. In these circumstances we must conclude that they have demonstrated the type of particularized interest in this controversy that assures that the issues will be litigated between parties having substantial, adverse interests.

### The Merits

We come therefore to the merits of the controversy. The Secretary of State has taken the position that our decision in *Farris ex rel. Dorsky v. Goss*, 143 Me. 227, 60 A.2d 908 (1948) requires him to treat the amendment by the 108th Legislature of a section of the uniform property tax law as an amended form of, or substitute for, the

---

6. The last sentence of Me.Const. art. IV, pt. 3, § 20 (1976 Supp.) provides as follows:

   "The full text of a measure submitted to a vote of the people under the provisions of the Constitution need not be printed on the official ballots, but, until otherwise provided by the Legislature, the Secretary of State shall prepare the ballots in such form as to present the question or questions concisely and intelligibly."

initiated bill, within the meaning of section 18 of the Maine Constitution, article IV, part 3. In the *Dorsky* case, an initiated bill had been received by the Legislature but not passed in its original form. Legislation was then passed in the same session which treated the same subject matter as the initiative bill in a manner inconsistent with it so that the two measures could not stand together. We held that such legislation was a "substitute" within the meaning of the constitution. Our decision in *Dorsky* was, in effect, to require the Secretary to place on the ballot the measure that had passed the Legislature as a measure competing with the initiated bill, so that the people could choose between them or reject both as section 18 provides.

In *Dorsky*, this court was faced with the problem of determining what sort of legislative action would qualify as a competing measure under section 18. There was serious doubt whether the Legislature was required to designate its measure as an amended form of, or substitute for, the initiated bill or merely enact a measure that was in fact inconsistent with it in order to trigger the requirement of the constitution, article IV, part 3, § 18, that "any amended form, substitute, or recommendation" of the Legislature be placed before the people with the initiative bill itself. We decided in *Dorsky* that merely enacting inconsistent legislation could be sufficient and, in that case, was sufficient.

■■ Article IV, part 3, section 16 of the Maine Constitution defines the circumstances in which the Legislature may pass emergency legislation and the procedure by which it may do so. Those provisions limit the use of emergency legislation to emergency situations. *Morris v. Goss*, 147 Me. 89, 83 A.2d 556 (1951). The Legislature may well be confronted with emergencies that require immediate action to avoid injury to the State. In such situations, the Constitution gives the Legislature the flexibility to make its measures effective as soon as approved by the Governor.

■ The Legislature should be free under our constitution to pass an emergency statute that amends laws challenged by an initiative measure without thereby complicating and confusing the initiative process. Last spring, in an *Opinion of the Justices*, Me., 370 A.2d 654 (1977), the members of this court noted how important it is that the Legislature have the authority to pass an emergency bill amending legislation that falls within the scope of an initiative and thereby make the amending measure effective immediately. We now hold, as the Law Court, that the Legislature has that authority. If the Legislature desires that a proposal be offered as an amended form of an initiated bill, it may invoke the *Dorsky* rule by passing a nonemergency measure, inconsistent with the initiated bill, that will be treated like an amended form of, or substitute for, the initiated bill. However, the constitution should not be interpreted as burdening the important emergency legislation process with a rule that designates emergency legislation as a measure competing with an initiative bill.

We believe our conclusion to be consistent with the limitation implicit in the rationale of the *Dorsky* case and to be in harmony with the special status accorded to emergency legislation in the Maine constitutional arrangements for referendum measures. The members of this court noted that special status in *Opinion of the Justices*, Me., 370 A.2d 654, 669 (1977), where we said:

"The importance of emergency legislation and the need that it be insulated from premature or ill-conceived disruption is recognized in § 17 of Part Third, Article IV of our Constitution. This section exempts emergency legislation from the referendum process—a process which suspends the effectiveness of laws until the law is ratified by popular election. This constitutional exemption from suspension is particularly important in the area of emergency tax legislation. *Morris v. Goss, supra.*

"The people may use the initiative process as provided by Article IV, Part Third, § 18 to challenge emergency legislation. But even this section refers only to the people's power to *repeal* emergen-

cy legislation. No mention is made of their power to *suspend* existing legislation. To read such a power into section 18 would be to undercut the policies expressly recognized in sections 16 and 17."

▮ We therefore hold that the Secretary of State was in error in treating the emergency legislation in this case as a competing measure. It should not be placed on the December 5 ballot. The initiated bill, by itself, must be submitted to the electors for acceptance or rejection.

The entry will be:

Judgment for the plaintiffs.

Judgment is declared that the Secretary of State shall not place the amendments to the Uniform Property Tax enacted as Public Laws 1977, chapter 564, section 131–A, on the ballot with the measure initiated by petitions filed with the Secretary of State January 19, 1977, as a competing measure.

Remanded to the Superior Court for entry of judgment in accordance herewith.

POMEROY and WERNICK, JJ., concurred but wrote separate concurring opinions.

All other Justices concurring.

### APPENDIX A

*Text of Initiated Bill*

"STATE OF MAINE

IN THE YEAR OF OUR LORD
NINETEEN HUNDRED AND
SEVENTY–SIX

AN ACT TO REPEAL THE STATE
PROPERTY TAX

Be it enacted by the people of the State of Maine, as follows:

Sec. 1. 20 M.R.S.A. § 3742, first and second paragraphs, as enacted by P.L.1975, C. 660, § 2 are repealed and the following enacted one in place thereof:

It is the intent of the Legislature to provide at least 50% of the cost of operation of the public schools from general fund revenue sources.

Sec. 2. 20 M.R.S.A. § 3747[8] as enacted by P.L.1975, C. 660, § 2 and amended by P.L.1975, C. 754, § 3 is repealed.

Sec. 3. 36 M.R.S.A. § 451[2] as enacted by P.L.1975, C. 660, § 5 is repealed.

Sec. 4. 36 M.R.S.A. § 452 second paragraph as enacted by P.L.1975, C. 660, § 5 is repealed.

Sec. 5. 36 M.R.S.A. § 453 as enacted by P.L.1975, C. 660, § 5 and P.L.1975, C. 754, § 6 is repealed.

Sec. 6. 36 M.R.S.A. § 453–A, as enacted by P.L.1975, C. 754, § 7 is repealed.

### STATEMENT OF FACT

This bill repeals the Uniform State Property Tax and returns to the municipalities the authority to set the property tax rate for public school purposes."

WERNICK, Justice (concurring).

I agree with the result reached in the Court's opinion, but I would arrive at it by a different rationale of decision.

At the outset, I distinguish *Farris ex rel. Dorsky v. Goss*, 143 Me. 227, 68 A.2d 908 (1948). There, no *emergency* enactment of the Legislature was involved and, hence, *Dorsky* simply does not address the questions now confronting us: (1) whether the Legislature has power, in the face of a pending initiative, emergently to enact effective law substantively relating to the initiated bill and (2) if so, what is the resulting relationship arising between the effective law emergently enacted by the Legislature and the initiated bill.

I agree with the opinion for the Court giving decisional force in this actual case to the proposition advisorily stated last spring in *Opinion of the Justices*, Me., 370 A.2d 654 (1977), that the Constitution empowers the Legislature emergently to enact effective law substantively bearing upon the subject-matter of an initiated bill.

It is a necessary corollary of this decision, in my view, that such an emergency enactment of the Legislature is outside the operative scope of the Section 18 directive concerning an "amended form, substitute, or recommendation of the Legislature" relative to an initiated bill.

The kind of legislative enactment which may qualify as an "amended form, substitute, or recommendation of the Legislature" under Section 18 is only such as is capable of being a "measure", thereby to be eligible to be a "competing measure" in relation to an initiated bill. The definition of "measure" in Section 20, and the manner of its utilization in Sections 16 to 19, inclusive, make plain to me that the intendment of the Constitution is that an already effective law cannot be a "measure"—a "measure" being that which is "proposed" to be, or is capable of being suspended from being, an effective law. Accordingly, I cannot attribute to the Constitution the anomaly which would result if the Constitution were held on the one hand to authorize the Legislature emergently to enact effective law and on the other hand to divest such effective law of that character by transforming it into a "measure" to be "competing" with in initiated bill. As was said in *Opinion of the Justices*, Me., 370 A.2d 654, 669 (1977):

> "The people may use the initiative process as provided by Article IV, Part Third, § 18 to challenge emergency legislation. But even this section refers only to the people's power to *repeal* emergency legislation. No mention is made of their power to *suspend* existing legislation. To read such a power into section 18 would be to undercut the policies expressly recognized in sections 16 and 17."

The conclusion that an effective law emergently enacted by the Legislature is outside the "amended form, substitute, or recommendation . . ." mandate of Section 18 is buttressed by the import of the further directive in Section 18 that an initiated bill enacted by the Legislature without change is subject to the referendum.[1]

This latter provision indicates that the initiative is provided as a mechanism to impel the Legislature to enact a bill desired by the electors so that it shall become effective as law in the same manner as if the Legislature had been the original source of the bill. Because the referendum applies to the Legislature's enactment without change of an initiated bill, first, an initiated bill thus legislatively enacted is not effective as law until 90 days after adjournment of the Legislature, and, second, the electors' resort to the referendum can further suspend its effectiveness as law.

That an initiated bill enacted without change by the Legislature must take such course clarifies the function contemplated for the "amended form, substitute, or recommendation . . ." provision in Section 18. Where the Legislature fails to enact an initiated bill without change and takes other affirmative action affecting the subject-matter of the initiated bill, absent the "amended form, substitute, or recommendation . . ." directive, it would be plain that (1) the initiated bill would itself go to the vote of the electors and (2) by resort to the referendum the electors could also require submission to their vote of the enactment of the Legislature bearing upon the subject-matter of the initiated bill. By use of the referendum the electors could give themselves the options of accepting the initiated bill, accepting the enactment of the Legislature, or rejecting both.

It thus appears manifest that the "amended form, substitute, or recommendation . . ." mandate of Section 18, especially as implemented by the decision in *Dorsky*, supra, functions to save the electors effort and expense. It creates a shortcut device which avoids the need that the electors take the additional step of invoking the referendum to subject to the vote of the

---

1. Section 18 so provides in the following language:

   "If the measure initiated is enacted by the Legislature without change, it shall not go to a referendum vote unless in pursuance of a demand made in accordance with the preceding section."

electors an enactment of the Legislature affecting the subject-matter of an initiated bill. The "amended form, substitute, or recommendation . . ." mandate incorporates directly into the initiative an equivalent of the referendum, thereby achieving the same ultimate options for the electors as would result, if with greater effort and expense, the electors were to supplement the initiative with a resort to the referendum.

This clarification of the function of the "amended form, substitute, or recommendation . . ." provision of Section 18 makes further apparent that the provision does not apply to effective law emergently enacted by the Legislature. Since (1) the Constitution plainly provides that the electors are without power to invoke the referendum against emergency enactments of the Legislature, including the emergency enactment without change of an initiated bill, and (2) as explained above, the "amended form, substitute, or recommendation . . ." provision of Section 18 functions as a shortcut equivalent of the referendum, it follows that where the Legislature emergently enacts effective law affecting an initiated bill, the "amended form, substitute, or recommendation . . ." provision of Section 18 must be inapplicable. As the emergency nature of such enactment puts it beyond the reach of the referendum, so it places it outside the compass of the referendum's shortcut equivalent, viz., the "amended form, substitute, or recommendation . . ." directive of Section 18.

I therefore agree that the Secretary of State erred in treating the effective law emergently enacted by the Legislature in this case as an "amended form, substitute, or recommendation of the Legislature" relative to the initiated bill.

However, as I see the problem, there is need for further analysis beyond this conclusion.

The decision that an emergency enactment of effective law cannot, as such, go to the electors as an "amended form, substitute, or recommendation of the Legisla-

ture" precipitates, here, the further question concerning the relation between the already effective law emergently enacted which bears upon the subject-matter of the initiated bill and the future course of the initiated bill as such.

Generally, no problem need arise as to whether an initiated bill is to be submitted to the people for their approval or rejection. Moreover, generally, should the electors accept an initiated bill, it would become effective law to be interpreted and applied in conjunction with whatever effective law the Legislature may have emergently enacted. These laws may be capable of co-existing or, in particular respects, the law produced by the electors' approval of the initiated bill may repeal by implication the law emergently enacted by the Legislature.

Yet, precisely because emergency enactments of the Legislature are effective law, the possibility cannot be ignored that their impact upon an initiated bill may be so comprehensive, and vital, as to render moot the initiated bill and require the electors to undertake a new initiative, under Section 18, to amend or repeal the effective law emergently enacted by the Legislature. This would seem more likely to be an actuality when, as here, the initiated bill has only the essentially negative thrust of being directed to the repeal of law as in existence at the time the initiative was undertaken. For example, should the Legislature see fit by emergency enactment to enact an immediately effective law entirely repealing the law which an initiated bill seeks to repeal, and the Legislature should go further and emergently enact another law on the same subject-matter but with significant substantive changes, I cannot conceive that the originally initiated bill could be deemed viable, somehow to be automatically amended and transposed to operate upon the new law emergently enacted by the Legislature.

In my view, therefore, it is a theoretical consequence of the Legislature's power to enact emergency laws affecting the subject-matter of an initiated bill—and of the corollary of such power that an emergently enacted effective law cannot constitute an

"amended form, substitute, or recommendation" relative to an initiated bill—that there is potential for a law emergently enacted by the Legislature to render entirely moot an initiated bill.

Here, as I see it, the effective law emergently enacted by the Legislature has no such mooting impact. The initiated bill's "Statement of Fact" sets forth the bill's purpose as follows:

"This bill repeals the Uniform State Property tax and returns to the municipalities the authority to set the property tax rate for public school purposes."

In contrast, the nature of the emergency legislation, as declared by the Legislature in a significant emergency preamble, acknowledges that the Legislature was not purporting to deal with underlying question of repeal of the "Uniform State Property Tax." Quite the contrary, the Legislature considered its emergency enactments to have merely interim consequence, resolving for the immediate future particular statutory conflicts. One of the emergency declarations states expressly that the

"Legislature is currently acting upon proposals for far-reaching changes in the areas of state funding for schools and of the uniform property tax; . . . ." (P.L.1977, Chap. 48)

It is therefore plain to me that while the initiated bill seeks repeal of the entire substance of the "Uniform State Property Tax" as it was originally enacted in 1975, the Legislature's emergency enactments relate solely to the necessity of avoiding interim statutory conflict until such later time as the ultimate questions of "far-reaching changes in the areas of state funding for schools and of the uniform property tax" might be resolved—*including* such ultimate resolution as could be produced by the electorate's acceptance of the initiated bill.

Hence, the Legislature's emergency enactments, although affecting portions of the initiated bill, have not rendered it utterly moot. The initiated bill, by itself, should be submitted to the electors for their acceptance or rejection.

POMEROY, Justice (concurring).

I join in both the opinion of Mr. Justice Godfrey and that of Mr. Justice Wernick. I see no inconsistency in the two.

The rationale described by Mr. Justice Wernick for his conclusion that an emergency bill is outside the "amended form, substitute or recommendation . . ." directive of section 18 and could render an initiated bill moot, might at first blush give rise to fears that some legislature at some time might thwart the people's effort to achieve their will by use of the initiative provision of our constitution. This, it might be feared, would result if the Legislature labeled as an emergency measure that which was not truly an emergency.

A reading of *Morris v. Goss*, 147 Me. 89, 98, 83 A.2d 556, 561 (1951) will quickly dissipate such fear.

In that case this court said:

"In examining the sufficiency of an emergency preamble the question of whether or not the Legislature has *expressed* (to wit, made an allegation of) *a fact or facts* is a question of law. Whether or not such fact or facts *can constitute an emergency* within the meaning of the Constitution is likewise a question of law. These questions of law may be reviewed by this Court." (Emphasis in original.)

Not only must we ascribe good will to legislative bodies, but it is now abundantly clear that this court remains the final arbiter of the question whether or not an emergency exists. Thus, the people's right to an initiative is judicially protected.